Case 4:21-cv-00204 Document 35 Filed on 01/06/22 in TXSD Page 1 of 20

United States District Court
Southern District of Texas
**ENTERED**
January 06, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LORI WASHINGTON, ex rel. J.W. § <br> Plaintiff, § <br> § <br> V. § <br> § <br> § <br> KATY INDEPENDENT SCHOOL § <br> DISTRICT, § <br> § <br> Defendant. § | CIVIL ACTION NO. H-21-204 |

### MEMORANDUM OPINION AND ORDER

J.W. was a special needs student at Katy Independent School District when he experienced an emotional breakdown, tried to leave the school, and was stopped by a school police officer who used a taser to keep J.W. in the building. The tasing caused J.W. to urinate and to defecate on himself. J.W. did not return to school for most of the school year and missed many school days the following year. His mother, Lori Washington, sought a hearing under the Individuals with Disabilities Education Act, claiming that the Katy Independent School District failed to provide J.W. with a Free Appropriate Public Education. 20 U.S.C. §§ 1400, *et seq*. (Docket Entry No. 1). A special hearing officer held a two-day due process hearing and denied relief. Ms. Washington appealed to this court on her son's behalf. The parties have cross-moved for summary judgment.

Based on careful consideration of the pleadings; the parties' motions, responses, and replies; the record; the arguments of counsel; and the applicable law, the court grants the district's motion for summary judgment and denies Ms. Washington's motion for summary judgment and motion to strike. The reasons are set out below.

I.     **Background**

J.W. is now 22 years old. In August 2016, he transferred into the Mayde Creek High School in Katy ISD as an eleventh-grade student. He was diagnosed with an intellectual disability and an emotional disturbance, impacting "his daily functioning, ability to communicate and control his emotions." (AR 1773; Docket Entry No. 1 at ¶ 10). J.W. was entitled to special education services under the Individuals with Disabilities Education Act, 42 U.S.C § 12131, *et seq*.

On September 22, 2016, the school district held an Admission, Review, and Dismissal Committee meeting. (AR 1773). The Admission, Review, and Dismissal Committee decided to place J.W. in a "Life Skills" classroom and provide behavior support through the Positive Approach to Student Success program. (AR 1776). J.W. received an Individualized Educational Program for his academic courses, a behavioral plan, and various accommodations to support the plans. (AR 1779–89).

On November 30, 2016, J.W. and another student had a disagreement. (AR 2612–13). The school district describes it as an altercation between students. (Docket Entry No. 30 at 7). J.W. describes it as another student bullying him. (Docket Entry No. 29 at 7; Docket Entry No. 28 at 9). An upset J.W. tried to calm himself by retreating to a classroom used in his behavioral plan as his "safe space," but it did not work. He left that room and tried to leave the school building. (AR 2599, 2613–20). School staff stopped him. (AR 2599). The encounter escalated and a school resource officer—a security guard—tased J.W., causing him to urinate and defecate on himself. (2599–2302).

J.W. did not go to school for most of the 2016 to 2017 school year. (AR 1700–16). J.W. missed 98 school days in the spring 2017 semester. (AR 1704–16). He received zeros across all subjects. (AR 1653). His mother alleges that he was traumatized and felt unsafe returning to

school without some sort of accommodation to address the cause of the tasing incident. (Docket Entry No. 28 at 9).

Multiple employees reached out to Ms. Washington following the tasing incident. (AR 2561–62). An assistant principal contacted her by phone in January 2017 and asked if she would permit J.W.'s psychiatrist to speak with school district personnel. (AR 2562–65; Pl.'s Ex. 39).[1] Ms. Washington declined. (AR 2562–65; Pl.'s Ex. 39). The assistant principal and Ms. Washington discussed the tasing incident, but Ms. Washington ended the phone call before the assistant principal could fully explain. (Pl.'s Ex. 39).

Ms. Washington met with the school principal, Ronnie Edwards, in person. Ms. Washington wanted the resource officer who had used the taser transferred to another school, but Mr. Edwards explained that the police department, not the school district, made that decision. (Pl.'s Ex. 41). Mr. Edwards asked Ms. Washington if she wanted the school district to transfer J.W. to another school within the district. (Pl.'s Ex. 41). Ms. Washington responded that she had spoken with other school officials about transferring J.W., and that they had told her that it would be at her own expense and that she would need to provide transportation. (Pl.'s Ex. 41).

Ms. Washington alleges that the school district did not sufficiently respond to or communicate with her. The school district responds that Ms. Washington testified that she spoke to the district's diagnostician "billions" of times; one of J.W.'s teachers frequently, including one

---

[1] Ms. Washington moved to strike the exhibits labeled Petitioner's Audio-Video Exhibits 36–41. (Docket Entry No. 31). The court refers to these as Plaintiff's Exhibits 36–41. Ms. Washington argues that these audio files were not part of the administrative record and that they were not provided to the court. (Docket Entry No. 31 at 2). The record shows that the hearing officer admitted these exhibits into evidence and the exhibits were provided to the court as part of the administrative record. (AR 2544). The motion to strike is denied.

teacher every other day; and that school officials had sent her messages through J.W.'s brother, another student at the school. (AR 1985, 2558).

Ms. Washington alleges that four times between the November 30, 2016, tasing incident and May 22, 2017, she requested but did not receive an Admission, Review, and Dismissal Committee meeting. (Docket Entry No. 28 at 10; AR 1983). The school district disputes this. (Docket Entry No. 29 at 14). The school district's Executive Director of Special Education testified that the invitation for the spring 2017 Committee meeting was consistent with the district's practice of sending the parent a letter with multiple potential dates when school personnel had been "unable to get an ARD scheduled." (AR 2363). This also explains why the spring 2017 invitation differs from earlier invitations to Ms. Washington, which listed only one meeting date. (AR 2364). The school district argues that the invitations are evidence of the school's repeated "attempt[s] to schedule an ARD despite Lori W's unresponsiveness." (Docket Entry No. 29 at 14).

The school district alleges that it was finally able to arrange a Committee meeting, which took place on campus in March 2017. Lori Washington, J.W.'s counselor, the assistant principal, and the diagnostician attended. (AR 2407). The school district alleges that well before the meeting, on March 2, 2017, it sent two consent forms to Ms. Washington for J.W.'s family doctor and private therapist to complete. (AR 2314–17, 2408). The record contains two "consent for disclosure of confidential information" forms, with notations that they were "sent/mailed" on March 2, 2017. (AR 1810–13). Ms. Washington testified that she never received the forms. (AR 1976, 2405, 2608, 2687–88, 2678–79). The school district did not receive the information.

Ms. Washington testified that near the end of the 2016-2017 school year, she went to Mayde High School and asked the district to transfer J.W. to a different school. (AR 1973). She

4

testified that she was told that J.W. could be transferred, at her expense, which apparently meant transportation, although that's unclear. (AR 1973). She also testified that she was told that homeschooling was not an option because of J.W.'s special needs. (AR 1973).

An assistant principal testified that the school officials wanted to schedule an Admission, Review, and Dismissal Committee meeting in February or March 2017, but the school did not receive responses from Ms. Washington. (AR 2405). The school diagnostician provided three dates to Ms. Washington, who chose April 24, 2017. (AR 2405–06). Ms. Washington declined to allow the school district to discuss J.W. with his outside healthcare providers, which the assistant principal and school psychologist testified was needed to determine if homeschooling was appropriate, especially because J.W. was not going to school. (AR 2608, 2687–88).

At the April 24, 2017, Admission, Review, and Dismissal Committee meeting, Ms. Washington arrived with counsel, which she had the right to do. The parties agreed to reschedule the meeting so the school district's counsel could attend as well. (Docket Entry No. 29 at 10). At the April meeting, Ms. Washington reported that J.W. did not want to attend school or go outside and was seeing a private counselor and psychiatrist. (AR 1821).

The Committee met with Ms. Washington on May 22, 2017. (AR 1842). The district completed a Reevaluation of Existing Data on J.W. before this May meeting, including reviewing J.W.'s 2015 Reevaluation of Existing Data from his previous school district and his 2007 psychological evaluation. (AR 1818–1830). Ms. Washington told the school officials that "J.W. believed staff hated him and he was going to die." (AR 1872). The school district recommended extended school-year services for J.W., but Ms. Washington declined to accept transportation to get J.W. to these services. (AR 1873). The Committee recommended a Functional Behavior Assessment or counseling evaluation and made changes to J.W.'s Behavioral Intervention Plan,

5

including techniques for J.W. to manage his anger, communicate his feelings, and inform staff of signs of anger and triggers. (AR 1836–41, 1872–74).

Ms. Washington alleges that she wanted to address the cause of the tasing incident and the resulting issues at the May 22 Admission, Review, and Dismissal Committee meeting, but she was told that the meeting was not the correct place to discuss this "disciplinary" problem. (AR 1968, 2399–2400). An assistant principal explained that the tasing incident was not a proper topic for the meeting because it was "not part of the education programming for J.W." (AR 2399–2400). Ms. Washington testified that she asked for another meeting to discuss the tasing and the classroom and bullying issues that led up to it, but another meeting was never held. (Docket Entry No. 28 at 11; AR 1967–68).

J.W. failed every class in the spring 2017 semester. (AR 1659). He attended the first session of summer school in June 2017 to make up credit for missing English class in the spring 2017 semester, but he did not return for the second session. (AR 2592, 2598)

On October 2, 2017, the school psychologist completed a counseling evaluation of J.W. (AR 1892–94). The evaluation notes that J.W. had "missed several days of school" since January 2017 and is "fearful of attending school due to a significant incident." (AR 1892). The evaluation concluded that J.W. did not demonstrate frequent emotional or behavioral concerns in the school setting but noted that his behavior could escalate quickly when he was triggered. (AR 1893). The evaluation encouraged Ms. Washington to allow J.W.'s outside medical providers to talk to school personnel, but in the absence of their information, the evaluation concluded that additional school counseling was not needed. (AR 1893–94). The school psychologist testified that she continued to work with J.W., including by trying to tempt him to attend school by offering him snacks that he liked. (AR 2678–79).

6

Ms. Washington testified that a teacher contacted her in the fall of 2017 and recommended that she accept a graduation plan for J.W. (AR 1972). Ms. Washington alleges that the teacher told her this was "the only way to end the harassment J.W. experienced at school." (Docket Entry No. 28 at 13).

Ms. Washington alleges that J.W. attended school only "for a few days" in August, September, and October 2017. (Docket Entry No. 1 at ¶ 26). J.W. received As, Bs, and two Cs, in the 2017-2018 school year, but he missed school for at least part of the day on 105 days. (AR 1660, 1717–27). Ms. Washington alleges that because J.W.'s records were not dated, she was unable to tell if he was making progress consistent with his Individualized Education Program. (Docket Entry No. 28 at 13). Between the spring of 2017 and the spring of 2018, J.W. missed school on approximately 200 days. (AR 1710–27).

On May 14, 2018, the district held another Admission, Review, and Dismissal Committee meeting and established a plan for J.W. to transfer to another school, enroll in a vocational program, and work with the Texas Workforce Commission. (AR 1921–54). The plan called for J.W. to attend the 2018 graduation ceremony, receive a "certification of completion of four years," and to participate in Life Skills classes and a Work-Based Learning program during the 2018 to 2019 school year. (AR 1945–46). None of this happened. J.W. transferred to another school district in the fall 2018 semester. (AR 2571). This litigation followed.

After discovery, the parties moved for summary judgment. Ms. Washington argues, based on her own testimony, that following the tasing, J.W.'s IQ score dropped, he became socially isolated, and he overate as a coping mechanism. (Docket Entry No. 28 at 14). Ms. Washington argues that she is entitled to summary judgment based on the district's failure to provide academic and nonacademic benefits between spring 2017 and spring 2018, failure to create an Individualized

7

Education Program tailored to J.W.'s needs, and failure to address the cause of, and the trauma from, the tasing. (Docket Entry No. 28 at 22–28).

The school district argues that it is entitled to summary judgment because the record supports the hearing officer's decision that the district provided a Free Appropriate Public Education and did not violate J.W.'s or Ms. Washington's procedural rights. (Docket Entry No. 29 at 3).

In *Washington ex rel. J.W. v. Katy Indep. Sch. Dist.*, 447 F. Supp. 3d 583, 594 (S.D. Tex. 2020), this court concluded that the hearing officer was wrong in finding all of Ms. Washington's claims time-barred and remanded. On remand, the hearing officer concluded that Ms. Washington had timely asserted her claims that the district failed to implement the Individualized Education Program, failed to prevent or stop the bullying, and committed procedural violations. (AR 13). Considering these claims on the merits, the hearing officer concluded that Ms. Washington and J.W. did not meet their burden to show that the school district failed to implement J.W.'s Individualized Education Program or denied him a Free Appropriate Public Education based on bullying. (AR 14–17).

The hearing officer found that the school district had provided J.W.'s educational program in a collaborative manner, including following J.W.'s behavioral plan by using positive interventions, providing him a cool-down space, and allowing him to eat lunch outside the crowded lunch room. (AR 15). The hearing officer found that after the tasing, the district repeatedly tried to meet and talk with Ms. Washington to help J.W. return to school. (AR 15). The hearing officer also concluded that J.W. received both academic and nonacademic benefits when he attended school. (AR 15). The officer noted that J.W. received mostly A and B grades in 2017-2018 and earned enough credits to graduate. (AR 15). He also received "job training skills" and learned

8

"how to deal with his misperceptions." (AR 15–16). Finally, the hearing officer found no procedural rights violations. (AR 20). Ms. Washington appeals.

## II. Summary Judgment

### A. The Legal Standard for Reviewing an IDEA Appeal

A district court reviews the decision of a due-process hearing officer "virtually *de novo*." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). The court "receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 582–83 (5th Cir. 2009). "As a practical matter, the IDEA creates a presumption in favor of the education plan proposed by the school district, and places the burden of proof on the party challenging it." *Renee J. Hous. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 683 (S.D. Tex. 2017) (quotation omitted); *see also White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). In reaching this decision, "courts must be careful to avoid imposing their view of preferable educational methods upon the State." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

A district court adopts a different standard for reviewing a summary judgment motion in IDEA appeals. *E.R. by E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018); *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966–67 (5th Cir. 2016). In *E.R.*, the Fifth Circuit summarized the summary judgment standard for an IDEA appeal:

> Under 20 U.S.C. § 1415(i)(2)(C) . . . a district court must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) base "its decision on the preponderance of the evidence" and "grant such relief as the court determines is appropriate." The district court is required to "accord 'due weight' to the hearing officer's findings," but it "must ultimately reach an independent decision based on the preponderance of the evidence." Thus "the district court's 'review' of a hearing officer's decision is 'virtually de novo.'"

*E.R.*, 909 F.3d at 762 (citing *Seth B.*, 810 F.3d at 966–67); *see also Renee J.*, 333 F. Supp. 3d at 683. The standard of review is "more expansive than the usual *de novo* review for summary judgments, as prescribed by Federal Rule of Civil Procedure 56(a)." *E.R.*, 909 F.3d at 762. "[I]n IDEA proceedings, summary judgment 'is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.'" *Seth B.*, 810 F.3d at 967.

### B. The IDEA

"One of the primary purposes of the IDEA is to ensure that children with disabilities receive a 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'" *Juan P.*, 582 F.3d at 581; 20 U.S.C. § 1400(d)(1)(A). A school district must "(1) provide each disabled child within its jurisdiction boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered . . . in the least restrictive environment consistent with the disabled student's need." *Michael F.*, 118 F.3d at 247. A school must provide students eligible under the Act with "an individualized program of education" in the form of an Individualized Education Program. *Woody,* 865 F.3d at 309. "The [Plan] must be 'reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *Id.* (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1,* ⎯⎯ U.S. ⎯⎯, 137 S.Ct. 988, 999, 197 L.Ed.2d 335 (2017)). "The IDEA does not require an IEP that maximizes the student's potential, nor does it require educational opportunities 'substantially equal to the opportunities afforded children without disabilities.' " *Spring Branch,* 2017 WL 3017282, at *13, 2017 U.S. Dist. LEXIS, 110524 at *43 (quoting *Endrew F.*,

137 S.Ct. at 1001). "Instead, the IEP must be 'likely to produce progress, not regression or trivial educational advancement.'" *Id.* (quoting *Michael F.,* 118 F.3d at 248).

### III. Analysis

The Act imposes procedural and substantive requirements on school districts. *Spring Branch,* 2017 WL 3017282, at *13. Parents who disagree with their child's Individualized Education Program have the right to request an administrative due-process hearing. 20 U.S.C. § 1415(f). "When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is twofold." *Juan P.,* 582 F.3d at 583. A district court must first determine whether the district has complied with the IDEA procedures. *Rowley*, 458 U.S. at 206; *see also Juan P.*, 582 F.3d at 583. Second, the court must determine if the Individual Education Programs developed through the IDEA is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. If both requirements are satisfied, the district "has complied with the obligations imposed by Congress and the courts can require no more." *Id*. Ms. Washington's motion for summary judgment challenges only the hearing officer's decision as to the substantive requirements, but the court addresses both.

### A. The Substantive Requirements

#### 1. The *Michael F.* Factors

To determine whether a student with disabilities received a free appropriate public education, the court must assess whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael F. by Barry F.*, 118 F.3d at 253.

11

Ms. Washington challenges the hearing officer's conclusion that J.W. received academic and nonacademic benefits. She argues that "overall the district failed to provide J.W. [a Free Appropriate Public Education]," apparently attacking the school district for failing to meet any of the *Michael F.* factors. (Docket Entry No. 28 at 23). Her specific arguments are that J.W. did not receive an individualized program and that the school district did not address her concerns. These bear on the first and third *Michael F.* factors. The hearing officer addressed only the third and fourth factors. There is a mismatch in the arguments Ms. Washington makes here and those she raised before the hearing officer. For completeness, the court addresses both.

Ms. Washington argues that the school district failed to create a plan individualized to J.W.'s needs by failing to address J.W.'s absenteeism with tools such as "the use of home-bound services, a web camera, tape recording of classes, a tutor or even the provision of residential treatment services." (Docket Entry No. 28 at 24). Ms. Washington argues that the school district's executive director of special education conceded that the Admission, Review, and Dismissal Committee never addressed J.W.'s absenteeism. Ms. Washington also argues that the district did not address the cause of the tasing incident and instead told her that the special education meetings were not the proper setting for raising disciplinary issues. (Docket Entry No. 28 at 24). She argues that the school district failed to address J.W.'s trauma and failed to provide a new psychological assessment after the tasing. (Docket Entry No. 28 at 24). She argues that the outcomes of the spring and fall 2017 Committee meetings were "predetermined." (Docket Entry No. 28 at 25).

The school district notes that the special education director testified that "there were multiple meetings with staff to discuss concerns regarding [J.W.] not attending school and their inability to be able to contact [Ms. Washington]." (Docket Entry No. 30 at 8 citing (AR 2329–30)). The district disputes that the school psychologist refused to discuss J.W.'s "absenteeism,

12

school phobia, hatred of staff and himself," because the psychologist's evaluation of J.W. from October 2, 2017, included the note that "an incident occurred on school campus that caused much emotional distress returning to School for [J.W.]. Attendance has been minimal during the spring semester of his 11th grade year. As he feared coming back to school, he did begin attending more often during the sixth six weeks." (AR 1892).

The district argues that it was willing to discuss the effects of the tasing incident, and that at the May 22 meeting the staff was trying to put programming into place that would enable J.W. to be successful in the future. (Docket Entry No. 29 at 15–16). The district explained that the police officer's actions were not a proper topic of discussion at the Admission, Review, and Dismissal Committee meeting, which is limited to the "identification, evaluation, and educational placement of the child." (Docket Entry No. 29 at 16 (citing 34 C.F.R. § 300.501(b)(1)(i))). The district knew of the tasing and intended to develop a plan to address that incident and its effects on J.W., but the district did not view this disciplinary incident itself as a proper topic of discussion at the special education meeting.

The record supports finding that the district sought to address J.W.'s absenteeism but was limited by the lack of responses from Ms. Washington and her failure to get the district information from J.W.'s outside health care providers. The district needed this information to assess J.W.'s mental health needs after the tasing. (AR 1810–13; 1842–87, 2563, 2688; Pl.'s Ex. 38). Ms. Washington disputes her lack of responsiveness, but she provides only her own testimony in support. The district amply counters with documents, including documents reflecting contacts with Ms. Washington, efforts to schedule and invite her to attend meetings, and efforts to get records from J.W.'s outside providers. The district also submits testimony, including of the

assistant principal responsible for connecting with J.W., the school psychologist, and the school district's executive director of special education. (AR 2314–17, 2405, 2608, 2678–79, 2687–88).

The district provided evidence that Ms. Washington received the required paperwork for the Admission, Review, and Dismissal Committee to consider homebound services, but she did not return the paperwork. As a result, J.W. did not receive homebound services. (AR 1810–13, 2314–17, 2408, 2608, 2687–88). The record supports finding that the district offered extended school year services for J.W. to make up class credit in a smaller environment and offered transportation, but J.W. attended only one of the two sessions, and Ms. Washington refused to accept transportation from the district. (AR 1873, 2592, 2598). Ms. Washington agreed with the level of psychological services the district was providing at the May 22, 2017 meeting. (1872–74).

The school district conducted an evaluation of J.W. in October 2017, but concluded, in part because the district did not have information from J.W.'s healthcare providers, that he did not qualify for counseling. (AR 1893). The record does show that the school district provided J.W. with ways to control his anger, such as going to the behavioral classroom, avoiding lunch in the cafeteria, and receiving positive incentives for attending school. (AR 1873, 2707–14, 2778–79). The record supports finding that J.W.'s Individualized Education Program and Behavioral Intervention Plan were tailored to his needs.

Ms. Washington did not contest the second *Michael F.* factor—whether the school district administered the program to J.W. in the least restrictive environment—in her motion for summary judgment or before the hearing officer. Ms. Washington raises the third *Michael F.* factor in her argument that the plans failed to include parent training or parent counseling. This argument is relevant to whether the plans were implemented in a collaborative manner. The record shows that

14

they were. Ms. Washington attended the May 22, 2017, Admission, Review, and Dismissal Committee meeting. Some of her suggestions were added to J.W.'s Behavioral Intervention Plan. (AR 2051–52). Ms. Washington agreed to J.W.'s Individualized Education Program in 2017 and 2018, with attorney representation. If Ms. Washington objected to the Program agreed on at the May 22, 2017 meeting, the Committee would have needed to reconvene. She could have also insisted on a meeting to discuss the tasing incident outside the Committee setting. The school district would have been required to recess the May 22, 2017, meeting and hold a reconvened Committee meeting within ten days. 19 TEXAS ADMIN. CODE § 89.1050(g)(1). She did not do so.

"The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such." *White*, 343 F.3d 373, 380 (5th Cir. 2003). The record supports the hearing officer's conclusion that "the School District reached out multiple times to check on Student's well-being after the tasing incident, let Parent know the School District was still willing and able to help Student with skills to control his anger, and determine how to get Student back in school on a regular basis." (AR 15).

The final *Michael F.* factor, "[w]hether a student demonstrates positive academic and non-academic benefits[,] is 'one of the most critical factors in this analysis.'" *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813–14 (5th Cir. 2012). "The adequacy of a given [plan] turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S.Ct. at 1001. "[T]he IDEA 'generates no additional requirement that the services so provided be sufficient to maximize each child's potential.'" *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346 (5th Cir. 2000) (quoting *Rowley*, 458 U.S. at 198). Obtaining a "meaningful benefit" requires a school district to provide "a basic floor of opportunity that consists of access to specialized instruction and related services individually designed to provide [the student] with educational

benefit." *Houston Indep. Sch. Dist. v. VP*, 582 F.3d 576, 590 (5th Cir. 2009) (citations omitted). The benefits must be more than *de minimis*. *Id.* "Passing grades and advancement from year to year are factors that indicate a child is receiving meaningful educational benefit," unless they are "the product of unapproved deviations from the [Program]." *Id.* This "holistic perspective" is "not solely disability remediation." *Klein v. Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 398 (5th Cir. 2012). In evaluating progress, court may consider information from teachers with knowledge of a student's performance and from those responsible for administering the plans and counseling the student. *Michael F.*, 118 F.3d at 254. Courts look "to the individual student's progress or regress, rather than by comparison to the academic progress achieved by the student's peers." *T.L. as Next Friend of J.M. v. Florence Ind. Sch. Dist.*, No. 1:18-CV-1016-RP, 2020 WL 4434928, at *8 (W.D. Tex. July 31, 2020) (citing *Bobby R.*, 200 F.3d at 349).

Ms. Washington argues that the school district could not have provided an academic or nonacademic benefit in the spring 2017, fall 2017, or spring 2018 semesters because J.W. missed so many school days. She argues that J.W. passed his classes only because the few times he attended school, he performed well, but that this spotty record is not evidence of progress toward his Individualized Educational Program goals. She argues that the school district "steered J.W. into a sham graduation purely for social reasons," making his graduation irrelevant as evidence of academic progress. (Docket Entry No. 28 at 26).

The school district responds that Ms. Washington did not raise J.W.'s absenteeism as the basis for the denial of a Free Appropriate Public Education at the due-process hearing. As a result, that issue was not addressed by the hearing officer. (Docket Entry No. 30 at 10). Additionally, the school district argues that J.W.'s attendance was addressed at the May 22, 2017 Admission,

Review, and Dismissal Committee meeting and that Ms. Washington, not the district, was responsible for keeping J.W. home from school.

As to his academic progress, the district argues that J.W. did not receive credit for courses if his attendance was too low, but he nonetheless earned enough credits to graduate. (Docket Entry No. 30 at 10). He made up for missed coursework by participating in summer school and retaking courses in the fall 2017 semester. (Docket Entry No. 30 at 10). The school district argues that many students were given unusual flexibility that year because of displacement from Hurricane Harvey. (Docket Entry No. 30 at 10). Additionally, the district points to the vocational education plan it developed for J.W. to use after graduation to cement and implement what he learned before his graduation. This provides additional support that not only did the district plan to continue providing J.W. services, but that his graduation was not a "sham." (Docket Entry No. 30 at 8 n.3).

In finding a meaningful benefit, the hearing officer relied on the facts that J.W. "had mostly As and Bs in 2017-2018 and earned enough credits in high school to graduate." (AR15). The officer also noted that J.W. "received job training skills and was learning how to deal with his misperceptions from the [school psychologist]." (AR 16). The record supports the hearing officer's conclusion that "[w]hen J.W. attended school, he was successful academically." (AR 15). In the 2017-2018 school year, his grades were not only passing, but the majority of his grades were higher than 80. (AR 1660). One of J.W.'s teachers from summer school testified that he was respectful, followed directions, and was able to complete his work. (AR 2596–97).

The issue, as framed by Ms. Washington, is whether J.W.'s absenteeism means that he did not demonstrate academic or nonacademic progress, despite his grades. The *Michael F.* factors are "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA." *Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997). The inquiry "implicitly

seems to require determining whether the school district's actions caused the student to suffer an educational loss." *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1127 (10th Cir. 2008). A period of failing grades as a result of failing to attend school is a sign of lack of progress for that period. But absenteeism that frustrates implementing an Individualized Educational Program does not itself show that the Program was deficient. In *T.L.*, the court recognized "the 'tremendous barrier' that [the student's] poor attendance posed to his ability to make consistent behavioral and academic progress," but concluded that "[c]onsidering [the student's] progress when he did attend school, the positive feedback from teachers, the observations of evaluators, and the opinion of the [hearing officer] who had the opportunity to observe witnesses and make credibility determinations," the student had made sufficient progress. 2020 WL 4434928, at *9.

J.W.'s success in the grades he earned during the 2017 to 2018 school year and the absence of behavioral issues documented in the October 2017 evaluation support finding that his Individualized Education Program and Behavior Intervention Plan were "reasonably calculated" to provide him with academic and nonacademic progress. Ms. Washington has not pointed to evidence in the record to show that these positive indicators were inaccurate or otherwise undermined the hearing officer's findings. Ms. Washington has not met her burden of showing that this decision was in error.

### 2. The Failure to Provide a Safe, Non-Hostile School Environment

Ms. Washington argued to the hearing officer that J.W. was denied a Free Appropriate Public Education because of the district's failure to address bullying, which created a hostile school environment. Ms. Washington did not allege this as a claim in the complaint or raise it in the summary judgment briefs. The Fifth Circuit has recognized that a school district may deny a

student a Free Appropriate Public Education "by failing to convene a timely ARD meeting to address [the student's] bullying concerns and by allowing him to be bullied so extensively that he refused to attend school altogether." *Renee J. as Next Friend of C.J. v. Houston Indep. Sch. Dist.*, 913 F.3d 523, 531 (5th Cir. 2019).

The altercation on November 30, 2016, between J.W. and another student resulted in J.W. trying to leave the school building and led up to the tasing. But as the hearing officer noted, this court concluded the claims arising from the tasing were time-barred. *Washington*, 447 F. Supp. 3d at 593.

The only other alleged bullying incident, and the only one within the statute of limitations, arose after J.W. and a female student allegedly exchanged inappropriate messages outside of school. A school police officer took J.W.'s phone to investigate the incident. When Ms. Washington went to pick up the phone and her son, the same officer who was involved in the tasing incident was in the room with J.W. and "hovering" over him. (AR 1971). Ms. Washington described J.W. as "afraid" and "freaked out" because the officer had allegedly interrogated him and "led him to believe that he was going to jail." (AR 1971). The hearing officer concluded that there was no evidence that the school district was made aware of this incident or that this impacted J.W.'s ability to attend school. (AR 17). J.W. has not pointed to record evidence disputing this conclusion or addressed the school district's arguments that this conclusion was correct. This provides no basis for relief.

**B.     The Procedural Requirements**

A procedural violation by itself generally does not show a failure to provide a free appropriate public education. A procedural violation that results in "a loss of educational opportunity" may be enough. *Wood v. Katy Indep. Sch. Dist.*, 163 F. Supp. 3d 396, 401 n.3 (S.D.

Tex. 2015) (quoting *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 (5th Cir. 2003)). "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies—(i) Impeded the child's right to a FAPE; (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) Caused a deprivation of educational benefit." 34 C.F.R. § 300.513(a)(2).

Ms. Washington acknowledges the hearing officer's decision that the school district did not violate her procedural rights, but she has not argued on appeal how this decision was erroneous. The record supports the hearing officer's conclusion that Ms. Washington had an unimpeded "opportunity to participate in the decisionmaking process, and Student was not deprived an educational benefit." (AR 20). The school district has provided evidence showing that it included Ms. Washington in the decisionmaking progress, and that Ms. Washington's lack of responsiveness hindered her involvement. Ms. Washington has not shown that J.W. was denied a Free Appropriate Public Education or that she was denied the ability to participate in the decisionmaking progress.

## IV.     Conclusion

Ms. Washington's motion for summary judgment and motion to strike, (Docket Entry Nos. 28, 31), are denied. Katy Independent School District's motion for summary judgment, (Docket Entry No. 29), is granted. This case is dismissed, with prejudice. An order of dismissal is separately entered.

SIGNED on January 6, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge